**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | **CASE NO. 2:20-CR-139(10)** |
| **vs.** | |
| | **JUDGE SARAH D. MORRISON** |
| **MOHAMED SHARIF ALI MOHAMED, aka MoMo,** | |
| **Defendant.** | |

## SENTENCING MEMORANDUM OF THE UNITED STATES

The United States submits its Sentencing Memorandum regarding Defendant Mohamed Sharif Ali Mohamed, aka MoMo, whose sentencing is set for August 23, 2021, at 10:30 a.m. For the reasons below, the United States recommends that the Court impose a term of incarceration of 37 months, and a term of supervised release of three years.

## I. BACKGROUND

In early 2019, agents with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) began an investigation into possible cross-border firearms trafficking from Ohio into Canada. On August 19, 2020, following an extensive investigation, a federal Grand Jury in this District returned an Indictment charging eleven defendants, including Defendant Mohamed, in Count One with Conspiracy to Illegally Traffic Firearms, in violation of 18 U.S.C. § 371. (*See United States v. O. Hassan*, et al., S.D. Ohio No. 2:20-cr-139, ECF No. 3, ¶ 1.) And on November 19, 2020, a federal Grand Jury in the Southern District of Ohio returned an Indictment charging another defendant, Abdulwahab Sharif Mohamed Hassan, aka China, in Count One with Conspiracy to Illegally Traffic Firearms, in violation of 18 U.S.C. § 371, and in Counts 2 and 3 with violations of the federal straw purchase law, 18 U.S.C. § 922(a)(6).

On December 13, 2020, the Court joined these two cases. Together, both Indictments lay out a detailed conspiracy to obtain and stockpile firearms in the Southern District of Ohio for the purpose of illegally transferring them and selling them in Canada. As the indictments explain, the co-conspirators obtained the firearms through both legal and illegal means, stockpiled them, packed them into a void in the front compartment of Toyota Camrys, recruited female drivers to shepherd the Camrys into Canada, followed the drivers into Canada, and then arranged for the sale of the firearms in Canada. On March 8, 2021, the defendant pled guilty to Count 1 (conspiracy to traffic the firearms, 18 U.S.C. § 371).

## II. GUIDELINES RANGE/PRESENTENCE INVESTIGATION REPORT

The Probation Officer issued a final Presentence Report (PSR) on May 17, 2021. According to the PSR, the total offense level (TOL) is 29, which included the following:

- Base offense level: 18 (U.S.S.G. § 2K2.1(a)(5));
- Number-of-firearms enhancement: +6 (U.S.S.G. § 2K2.1(b)(1));
- Firearms trafficking: +4 (U.S.S.G. § 2K2.1(b)(5));
- Firearms left the U.S.: +4 (U.S.S.G. § 2K2.1(b)(6)(A)); and
- Less 3 points for acceptance of responsibility (U.S.S.G. § 3E1.1(b)).

The PSR further calculated the defendant's Criminal History (CH) Category as a I, with a resulting range of 87-108 months, which is statutorily restricted to 60 months. (PSR ¶ 99.) The Probation Officer did not identify any factors warranting departure from the guidelines range, though he did note some facts that may warrant a variance. (*Id.* ¶¶ 112-14.)

At this point, the defendant has two remaining objections to the PSR, both of which the Government joins. First, the PSR assessed the defendant with a base offense level of 18 because a number of the guns seized as part of the conspiracy were equipped with Glock conversion switches; these conversion switches make an otherwise semiautomatic handgun into an automatic

handgun.  (*See, e.g.*, PSR ¶¶ 45, 58.)  The PSR accurately lays out the facts at play in this case. Nevertheless, the Government agrees that the base offense level should be a 12.  The parties did not contemplate a base offense level of 18 during the negotiation and resolution of the plea agreement.  Moreover, any discovery underpinning the facts that could be used to support a base offense level of 18 was not part of the initial rounds of discovery in this case; and the discovery that drove the parties' plea discussions and ultimate resolution of this case did not include information about Glock switches.  Finally, the Government has agreed with all other objections on this issue in the context of the PSRs of the defendant's co-defendants. It would be unjust to proceed differently in this instance.  For these reasons, the Government joins the defendant's objection regarding the base offense level.

Second, the defendant objects to a 6-point enhancement for the number of firearms at play in this case, arguing instead that he should be assessed a 4-point enhancement.  The Government agrees.  The defendant stands in somewhat of a unique category in this conspiracy when compared to many of his co-defendants.  He was aware of the broader conspiracy.  And there was some collaboration between the defendant's firearms trafficking and the broader conspiracy—enough for the defendant to be charged with his co-defendants as a legal matter.  Based on the facts on the ground, beyond these overlaps, the defendant largely ran his own side gun-trafficking operation. And to that end, he was quite involved in the transfer of at least 8–24 firearms.  Given his position as running his own trafficking operation related to the broader conspiracy, the Government thinks it most fair to assess him an enhancement consistent with those 8–24 firearms.  Doing so would be consistent with the facts at play, and with the parties' plea agreement.

If the Court agrees with the parties, the defendant's total offense level comes out to a 21. With a CH of I, this would net an advisory Guidelines range of 37–46 months. The parties have entered into a Rule 11(c)(1)(C) plea agreement, which contains an agreed upon sentencing range of 0-37 months; the United States asks this Court to accept the plea agreement and sentence the defendant at the top of that range.

### III.    **ANALYSIS AND RECOMMENDATION OF THE UNITED STATES**

Sentencing requires a determination of the applicable guideline range, whether a departure is appropriate, and a consideration of the factors in 18 U.S.C. § 3553(a). *See Gall v. United States*, 552 U.S. 38, 49–50 (2007). Under this analysis, the Government submits for the following reasons that a term of incarceration of 37 months, and a term of supervised release of three years, is fair under the circumstances.

**A. Nature and Circumstances: Transnational Gun Trafficking Is a Serious Crime that Puts Lives in Danger**

A single straw purchase or illegal transfer of a firearm is "a callous and extreme risk to public safety." *United States v. Daniells*, No. 15-10150, 2017 WL 2256988, at \*4 (D. Mass. May 23, 2017). The illegal transfer of a firearm is a callous and dangerous act because guns are inherently dangerous, and guns in the hands of people who shouldn't have them is even more dangerous. It is a callous and dangerous act because it skirts the regulatory framework in place to track and monitor the sale and re-sale of dangerous guns. *See United States v. Arzu*, No. 5:07 CR 166, 2007 WL 2713908, at \*3 (N.D. Ohio Sept. 17, 2007) (noting that "[t]he access to firearms through illegal channels is a problem for law enforcement of immense p[ro]portions," which, in part, justifies "a sentence at the highest level of the advisory Guidelines range"). And it is a callous

and dangerous act because it entails a fundamental lack of care about what happens with the guns afterwards—or to the people they hurt or even kill.

The circumstances of this case are aggravated beyond even a run-of-the-mill straw purchase or illegal transfer. First, there wasn't just one straw purchase or transfer of a gun to someone who shouldn't have it. The defendant was involved in a conspiracy in which **8-24 guns** were transferred to people who shouldn't have them. Stated another way, the defendant's conduct significantly amplified the potential danger of an illegal firearms transfer. *See United States v. Elsaddique*, 252 F. App'x 992, 993 (11th Cir. 2007) ("[The defendant] used a false name to purchase three firearms. The act alone creates a significant danger to the public, which is only increased by the possibility that he made the purchase on someone else's behalf—someone who may have had a more serious and more recent criminal history.").

This case also involves the transnational bulk transfer of firearms, which takes it out of the rubric normally applied to a standard straw-purchase case. In this instance, Canada has seen fit to regulate firearms much more stringently than America. Fewer people have guns and fewer people can buy them. When guns from America illegally flood into Canada, our country's issues with gun violence get passed onto a neighboring country that desperately does not want them—for all the reasons laid out above. In the course of this case, the investigation further revealed that the mark-up for illegally purchased firearms can be significant in Canada—often more than five times, and up to 25 times, the retail value of the guns in the States. This represents a lucrative, difficult-to-track black market that is now creating dangers for Canadian citizens and law enforcement. The authorities in Canada also made clear during the investigation that the illegal proliferation of guns into their country was an ever-growing problem that Canadian law enforcement was working

furiously to stem. Ohio, in fact, has become a priority for them, as the authorities in Canada indicated that Ohio is the number one source state for firearms recovered in crimes in Canada.

The Government respectfully submits that a sentence of 37 months is appropriate given the serious nature of the conduct at issue, and given the aggravating factors present.

**B. History and Characteristics: The Court Should Take into Account the Defendant's History of Police Encounters and His Using and Selling Drugs**

The Government anticipates arguments from the defendant at sentencing that point to his minimal criminal history as reason for mitigation. In the normal course, that might carry some weight. It should carry less weight here. The nature of this case undermines any such arguments. Being involved in a conspiracy in which numerous firearms were trafficked to another country is serious, inherently dangerous conduct. The defendant has put countless peoples' lives in danger. And, the defendant's past shows he is not a stranger to violating the law, including using and selling drugs, and possessing firearms when he shouldn't.

The Defendant has been involved in at least eight different incidents that included law enforcement contact or intervention. The reports of those incidents, which were entered into the record during the defendant's detention hearing, are outlined below:

1.) April 10, 2018 (Doc. 141-1, Det. Hr'g Ex. 1, p. 17) - <u>ASSAULT:</u> In this incident, the defendant's former girlfriend called the police at 1:45 a.m. because she got into a fight with the defendant while riding in his car. The defendant grabbed the victim around the neck, restricting her airway, and punched her with a closed fist. The defendant had her cell phone, which he initially would not return to her, only returning after kicking her out of his car at a cemetery several miles away. Although the officers did not observe any obvious injuries on the victim, they did notice that the victim's voice was strained and raspy, which is consistent with having been choked.

2.) April 13, 2018 (Doc. 141-1, Det. Hr'g Ex. 1, pp. 24-26) - <u>DISORDERLY CONDUCT</u>: In this incident, two vehicles, one of which was driven by the defendant, were parked in handicapped parking spots at a bank in the Easton area of Columbus, Ohio. Although they were both parked in handicapped parking spots, neither vehicle had a handicapped parking placard displayed. The three males who came in these two cars, one of which was the defendant, were outside the bank and an officer approached them about the parking issue. One of the males said he was going into the bank, and the officer asked for their identifications. At this point, the incident escalated dramatically. The officer went to his police cruiser to write citations for the two drivers of the vehicles, when all three males immediately began cursing at and berating the officer. They approached the officer's cruiser door to within a distance of one foot, and they were waving large stacks of cash, filming with cell phone cameras, and cursing loudly. The officer asked all three males to stand away from his cruiser and none of them complied; instead, they continued in their disorderly conduct and accused the officer of being racist. They did briefly walk away, but then came back to the cruiser to argue about the citations. Other officers arrived and the three males, including the defendant, continued to scream profanity and behave in a disorderly fashion. The defendant was issued a citation for improperly parking in a handicapped parking spot and he was permanently banned from coming to the Easton property.

3.) April 13, 2019 (Doc. 141-1, Det. Hr'g Ex. 1, p. 28) - <u>ASSAULT</u>: In this incident, the same victim from the April 10, 2018 incident (above) called the police because the defendant took her cell phone and money, which totaled $2,460 (Doc. 141-1, Det. Hr'g Ex. 1, p. 32). The victim said that when she tried to get her items back, they wrestled, and then the defendant kicked her in the head and face several times. During their struggle, the victim fell down the stairs. The victim

had no apparent injuries and she refused to complete a witness statement, saying she did not want to press charges; she just wanted her property back.

4.) May 7, 2019 (Doc. 141-1, Det. Hr'g Ex. 1, p. 41) - PISTOL WHIPPING / GUN INCIDENT: In this incident, Ibrahim Ali, who is defendant number 9 in this Indictment, reported that he got into a fight with a "male acquaintance" (whom he did not want to name). At first, the male acquaintance hit him in the side of the head with a firearm. When a crowd began to converge, the male acquaintance pointed the firearm at the crowd and then fired it into the air. Someone at the scene identified the person as "Mohamed" (Ex. 1, p. 36).

5.) May 11, 2019 (Doc. 141-1, Det. Hr'g Ex. 1, p. 52, PSR ¶ 74) - RAN FROM POLICE / CRACK POSSESSION: In this incident, a traffic stop was conducted on a vehicle in which the defendant was riding as a passenger. When the vehicle stopped, the driver and the defendant immediately jumped out of the car and fled. They ignored numerous police orders to stop. The officers chased the defendant and the driver, which led them down a few streets but, after he jumped over a fence, the defendant was apprehended. During a search incident to arrest, the defendant was found to have crack cocaine in his front pants pocket.

6.) June 18, 2019 (Doc. 141-1, Det. Hr'g Ex. 1, p. 54) - MARIJUANA DISTRIBUTION: In this incident, law enforcement observed the defendant conduct what they believed to be a hand-to-hand drug buy in a parking lot. When the vehicle containing the people who were believed to have purchased the drugs drove away, a traffic stop was conducted on their vehicle. The two individuals in the vehicle had marijuana in their possession and admitted they had just purchased the marijuana from the defendant.

7.) June 20, 2019 (Doc. 141-1, Det. Hr'g Ex. 1, pp. 69-71; PSR ¶ 74) - <u>FIREARM IN VEHICLE WHEN CONCEALED CARRY PERMIT SUSPENDED</u>: In this incident, law enforcement observed the defendant conduct what they believed to be a hand-to-hand drug buy in a parking lot. The defendant got into a vehicle and drove away in an evasive manner. Upon conducting a traffic stop on the defendant, the defendant and the passenger immediately got out of the vehicle. The officer ordered both men back into the vehicle and, although the passenger complied, the defendant did not. The defendant remained outside the vehicle. Officers could smell burnt marijuana coming from the car. Without being asked any questions by the officers, the defendant volunteered that he had a concealed carry permit and so the officer asked him if he had a gun in the car; the defendant would not answer but instead reiterated that he had a concealed carry permit. Upon searching the vehicle, a Glock 29 was found upside down in the center console area, along with a loaded magazine, and marijuana shake was found throughout the vehicle. The defendant's concealed carry permit was found to have been suspended, and the defendant was charged accordingly.

8.) February 19, 2020 (Doc. 141-1, Det. Hr'g Ex. 1, pp. 72-87) - <u>SEARCH WARRANT WITH DRUGS IN HOUSE / LIED TO POLICE ABOUT NAME</u>: In this incident, law enforcement executed a search warrant at a residence where a total of eight individuals, including the defendant, were found. Law enforcement created a list of the names of the people present in the residence (Doc. 141-1, Det. Hr'g Ex. 1, p. 72) and they took pictures of the people who correspond to the names. The defendant's name is not on the list (Doc. 141-1, Det. Hr'g Ex. 1, p. 72), but his photograph is included as the second person on the list (Doc. 141-1, Det. Hr'g Ex. 1, p. 73); and, notably, the date of birth provided for the person who matches the defendant's picture

is the defendant's date of birth. Therefore, the defendant lied to law enforcement about his name. During the execution of the search warrant, more than 100 grams of cocaine, more than 18 grams of crack cocaine, and more than 700 grams of marijuana were found, and some of the drugs were packaged for resale. Numerous items indicative of drug trafficking, such as scales and sandwich baggies, were recovered, along with guns and cash. Moreover, based on the cocaine and pans discovered on the stove, it is clear that the occupants of the residence were preparing to cook cocaine into crack cocaine.

In addition to his eight police-involved incidents, the United States admitted numerous screen shots of videos from the defendant's Snapchat account. The majority of the images are screen shots that were taken from videos posted by the defendant on Snapchat between May 29, 2019, and April 22, 2020. In those screen shots, there are many images of the defendant: using drugs, often marijuana or "purple drank" [1] (Doc. 141-2, Det. Hr'g Ex. 2, pp. 12, 13, 25, 27, 32, 37, 40, 56, 61-62, and 67); offering to sell various drugs, including marijuana, Percocet, promethazine-codeine (aka "lean"), Xanax (aka "bars"), and others (Doc. 141-2, Det. Hr'g Ex. 2, pp. 6, 8, 10, 17-19, 21, 28, 30, 34, 35, 39, 43, 45, 46, 48, 54, 55, and 58-59); in possession of firearms (Doc. 141-2, Det. Hr'g Ex. 2, pp. 4, 14, 23, and 65); in possession of large stacks of cash and expensive jewelry (Doc. 141-2, Det. Hr'g Ex. 2, pp. 2, 15, 33, 38, 50, 51, 52, 63, and 68-69); and disrespecting law enforcement and judges (Doc. 141-2, Det. Hr'g Ex. 2, pp. 10, 25, 40, and 41). Lastly, the United States admitted a video that showed a video of "purple drank", which was taken on the

---

[1] "Purple drank" is often known as "lean." Purple drank, or lean, consists of a prescribed cough syrup that often contains promethazine and codeine, both controlled substances. Individuals who consume purple drank or lean often do so by mixing the syrup with soft drinks, such as Canada Dry or Sprite.

morning of September 30, 2020, just a few hours before the defendant turned himself into the Marshals.

Although it is accurate that the defendant is a CH I, given the numerous interactions he had with law enforcement in a short period of time and his clear involvement in selling and using drugs, the defendant clearly is a danger. The circumstances of these police encounters underscore his dangerousness. He has a penchant for possessing firearms, using and selling drugs, and getting in violent altercations. Moreover, his criminal activity and interactions with law enforcement indicate either that he does not believe the law applies to him, that he does not respect law enforcement, or that he is undeterred from future criminal conduct even when he does encounter law enforcement. His sentence should reflect the seriousness of his history and characteristics, promote respect for the law, and deter the defendant from engaging in further serious criminal conduct.

**C. Unwarranted Sentencing Disparities: The Defendant Was Heavily Involved in the Conspiracy**

This is a large transnational firearms-trafficking crime, with guns that ended up in the hands of serious criminals in Canada. This case involved 8-24 firearms. Fourteen defendants were charged; 13 have now pled. This defendant was an integral part of his wing of the conspiracy. As with all conspiracies, the success of the conspiracy is reliant on the conspiracy members doing their parts, and the defendant's involvement in this conspiracy was extensive. As provided in the PSR, "[t]he defendant's involvement in the conspiracy included traveling from Columbus to Canada on October 5, 2018 and January 28, 2019 in furtherance of the conspiracy. Additionally, he recruited a female driver who made several trips on behalf of the conspiracy and who was ultimately interdicted at the border with firearms in her vehicle. [The defendant] arranged the

11

details for the female driver's trips, including when the trips took place, which rental car the female driver took, what happened once the driver got to Canada, how and when the driver came back to the United States, and how money associated with the illegal activity would be transferred back to the United States. Additionally, he recruited at least one other coconspirator, allowing the coconspirator to be involved as well." (PSR ¶ 50.)

Based on the above, the Government sees the defendants in this case falling into two tiers of culpability—an upper tier and a lower tier. The Government views the defendant as falling toward the bottom of the upper tier. The defendant's sentence should reflect the seriousness of the offense and the seriousness of the defendant's role in it.

## IV.   <u>CONCLUSION</u>

The defendant knowingly participated in a conspiracy to traffic a large number of guns to Canada.  The circumstances indicate that he knew the guns would be put into the hands of dangerous individuals.  Moreover, the defendant was involved in illegal firearms possession, and selling and using drugs, during the time he was involved in the conspiracy.  He is dangerous and his sentence should reflect as such.  For these reasons, the Government submits that a term of incarceration of 37 months, and a term of supervised release of three years, would be sufficient but not greater than necessary to further the ends of sentencing.

Respectfully submitted,

VIPAL J. PATEL
Acting United States Attorney

*s/Kelly A. Norris*
KELLY A. NORRIS (0081254)
S. COURTER SHIMEALL (0090514)
Assistant United States Attorneys
303 Marconi Boulevard, Suite 200
Columbus, Ohio 43215
Office: (614) 469-5715
Fax: (614) 469-5653
E-mail: Kelly.Norris@usdoj.gov
E-mail: Courter.Shimeall@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Sentencing Memorandum of the United States was served this August 16, 2021, electronically upon all counsel of record for Defendant Mohamed Sharif Ali Mohamed, aka MoMo.

*s/Kelly A. Norris*
KELLY A. NORRIS (0081254)
Assistant United States Attorney